## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOANNE NELSON,** | : | **Civil No. 4:24-CV-263** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts,

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. See <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

The plaintiff in this case, Joanne Nelson, applied for benefits under Title II of the Social Security Act on September 20, 2021. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Nelson was not disabled from the date of her application through the date of the ALJ's decision, January 30, 2023. Nelson now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. She challenges the ALJ's decision not to include additional stand/walk limitations in her light work RFC, despite at least two experts finding she was capable of performing the stand/walk requirements of light work. She also challenges the ALJ's treatment of her fibromyalgia and mental impairments, arguing the RFC is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that substantial evidence

2

supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we recommend that the district court affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

### A. Background

The administrative record of Nelson's disability application reveals the following essential facts: On September 20, 2021, Nelson applied for benefits under Title II of the Social Security Act, alleging an onset of disability beginning August 24, 2020. (Tr. 72).  According to Nelson, she was completely disabled due to the combined effects of Sjogren's syndrome, fibromyalgia, chronic fatigue, depression, post mastectomy mobility issues, Hashimoto's thyroiditis, and gastroparesis. (Id.) Nelson was born on June 22, 1961, and was considered an individual of "advanced age" from the alleged onset date through June 22, 2021, when she turned sixty and changed age categories to an individual "closely approaching retirement age" under the Commissioner's regulations. (Id.) She has an associate's degree and previously worked as an office manager. (Tr. 49-50).

3

At the disability hearing, Nelson testified she was primarily unable to work due to symptoms from her autoimmune issues,[2] including chronic fatigue, brain fog, and muscle weakness making her unable to sit and focus for significant lengths of time. (Tr. 51-52). She also reported experiencing a flu-like ache throughout her body. (Tr. 52). Other than for pain, she testified there is no treatment for her autoimmune symptoms. (Tr. 54). As to her mental conditions, Nelson testified that her anxiety and depression contribute to her inability to concentrate and complete detailed tasks but that she was managing those conditions without medication. (Tr. 55). She testified that she could stand and walk for only minutes at a time but used no assistive device and had no difficulty sitting. (Tr. 57). Despite these impairments, she still lived alone, and was able to drive, manage her personal care, and household chores. (Tr. 48, 57-59).

---

[2] At the hearing, Nelson attributed her symptoms to her "autoimmune issues." We note that, while she was diagnosed with Sjogren's, an autoimmune disorder that causes dry eyes and mouth, her rheumatologist noted that she was also under the misapprehension that fibromyalgia is an autoimmune disease but that "there is no evidence for this and [fibromyalgia] is a chronic pain syndrome." (Tr. 561). From the context of the record, we assume when Nelson refers to symptoms from her autoimmune issues she is also referring to her fibromyalgia.

## B. <u>The Longitudinal Record of Nelson's Physical Impairments</u>

With regard to Nelson's physical impairments, our summary of the record focuses on her fibromyalgia since the plaintiff primarily challenges the ALJ's treatment of her symptoms with regard to this impairment.[3] The medical record indicates that Nelson was diagnosed with fibromyalgia around 2005, (Tr. 800), and saw rheumatology between 2006 and 2008 but did not return until September 2021, a treatment gap of many years. (Tr. 561). She attended physical therapy between June 2021 and October 2021, primarily to treat neck pain.   (Tr. 753-73). On September 16, 2021, she presented for a rheumatological consultation for Sjogren syndrome and fibromyalgia at which she reported widespread muscle discomfort and fatigue. (Tr. 561). The rheumatologist concluded no additional treatment for Sjogren's, beyond topical therapies, was needed and since Nelson did not previously tolerate pain medications for fibromyalgia, it was suggested she continue off medications. (Id.) A physical examination was unremarkable, and an annual follow-up was recommended. (Tr. 561, 563-64).

---

[3]  Moreover, the ALJ concluded Nelson's Hashimoto's thyroiditis, breast cancer/status-post mastectomy, migraines, right sensorineural hearing loss (SNHL), Sjogren's syndrome, and gastroesophageal reflux disease (GERD)/hepatic steatosis were not severe, but acknowledged they were considered in the RFC nonetheless. The plaintiff does not challenge this conclusion as to her other physical impairments.

In February 2022 Nelson saw her primary care doctor, Dr. Brian McDonald, complaining of symptom flares of fibromyalgia including weakness and fatigue as well as neck pain. (Tr. 853). She also noted worsening brain fog and difficulty concentrating but stated it had not caused any functional deficits, that she lived alone, managed her own finances, was not making mistakes in her checking account, and had no memory issues. (Id.) Dr. McDonald's physical examination notes state Nelson looked "better than her diagnoses and her chief complaints" and were overall unremarkable, noting normal range of motion in her neck, no abnormal tenderness, normal coordination, and no abnormal psychiatric findings. (Tr. 855).

Nelson underwent a consultative examination on February 23, 2022, with Dr. Ziba Monfared. (Tr. 800-03). She reported flu-like muscle aches all over with pain that can reach 9/10 on a daily basis. (Id.) But she also reported living alone and being totally independent with her activities of daily living including cooking, cleaning, laundry, and shopping. (Tr. 801). The examination showed normal gait with no assistive device, ability to walk on heels and toes without difficulty, 80% squat, normal stance, full strength in her upper and lower extremities, and no sensory deficits. (Tr. 802-03). Nonetheless, Dr. Monfared did estimate 18/18 trigger points due to tenderness all over the trigger points, indicative of fibromyalgia pain. (Id.)

6

In March 2022, Nelson returned to Dr. McDonald for a follow-up. She again reported fatigue, and muscle aches and reported gait problems an myalgias, dizziness, weakness, and light-headedness. (Tr. 824). Dr. McDonald reviewed lab work seeking objective data for an autoimmune diagnosis which was normal except for elevated CRP which had been noted in the past. (Tr. 823). Dr. McDonald noted no clear diagnosis due to lack of objective data. (Tr. 825). Nelson declined a therapeutic trial of anti-inflammatory medications. (Id.)

The medical record for the remainder of the relevant period, with regard to her fibromyalgia, is relatively meager. She reported to the emergency room on October 30, 2022, complaining of extreme weakness and fatigue for seven days but was released as "asymptomatic" after vitals, a physical exam, and labs were unremarkable. (Tr. 1270). She later reported she was unsure if she had the flu or a flare of fibromyalgia. (Tr. 1361). She was released and advised to follow up with her primary care doctor. (Id.) In early November 2022 she visited an endocrinologist for management of hypothyroidism where she reported fatigue and muscle aches as well as anxiety and depression with brain fog and insomnia. (Tr. 1361). She reported a ton of family-related stress. (Tr. 1362).

## C. **The Longitudinal Record of Nelson's Mental Impairments**

There are also scant records documents Nelson's mental impairments. Aside from reporting symptoms of brain fog and difficulty focusing to her primary care provider, (Tr. 832, 852), she was treating her anxiety and depression with therapy. Her treating psychiatrist, Dr. Sharon Kennedy, reported she had been treating Nelson weekly since October 2019 when she was diagnosed with major depressive disorder and generalized anxiety disorder. (Tr. 781). In a summary of care statement dated January 14, 2022, Dr. Kennedy stated that Nelson's symptoms over the two years she had been treating her had varied in intensity but that, at the time, she continued to experience significant depression and anxiety and had difficulty functioning in the earlier part of the day. (Tr. 781-82). She attributed missed appointments to flare-ups in her physical symptoms, which had remained undiagnosed, a fact she indicated exacerbated her psychological symptoms. (Tr. 782). She also noted stressors of financial insecurity and isolation of the pandemic. (Id.)

Nelson was examined by consultative examiner Dr. Amanda Kochan-Dewey on February 23, 2022, who noted intact attention and concentration, memory, and average intellectual functioning. (Tr. 789). She noted independent activities of daily living and ability to manage funds. (Tr. 790).

8

### D. **Medical Opinion Evidence**

In addition to the objective medical evidence, numerous experts opined on the Nelson's ability to perform work-related activities considering her physical and emotional impairments. As to her physical impairments, two state agency consultants, consultative examiner, Dr. Monfared, and Nelson's treating primary care physician, Dr. McDonald, opined on her physical residual functional capacity (RFC). The two state agency consultants and the consultative examiner all reached relatively similar opinions indicating Nelson was capable of light work, while her treating physician, Dr. McDonald, opined she had far greater limitations.

On February 23, 2022, following his examination of the plaintiff, consultative examiner Dr. Monfared opined she could sit for eight hours, stand for seven hours, and walk for five hours in an eight-hour workday and that she could frequently perform manipulative activities but only occasionally perform any postural activities except she could frequently crawl. (Tr. 807). In March 2022, state agency consultant Dr. Levandoski opined she could lift and carry twenty pounds occasionally and ten pounds frequently and could stand and/or walk and sit for about six hours in an eight-hour workday, but had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 78-79). Dr. Levandoski noted that Nelson's activities of daily living were not significantly limited, her treatment for fibromyalgia an

Sjogren's had been routine and conservative, and that she had been offered steroids and pain medication for her alleged pain by her primary care physician but had declined them. (Tr. 80). On reconsideration, state agency consultant Dr. Cuozzo concurred with the assessment of Dr. Levandoski that Nelson could stand and/or walk and sit for about six hours in an eight-hour workday but would limit her to only occasionally climbing ramps/stairs, balancing, stooping, kneeling, and crawling, and opined she could never climb ladders, ropes or scaffolds due to dizziness. (Tr. 89).

In contrast, Nelson's treating physician, Dr. McDonald, opined she would be significantly more limited in her ability to perform work-related activity. Specifically, Dr. McDonald opined that Nelson could stand/walk less than two hours and sit about two hours in an eight-hour workday, that she would need hourly unscheduled breaks due to muscle weakness and fatigue, that she could occasionally lift less than ten pounds and never twenty pounds or more and would be off task 25% or more of an average workday.[4] (Tr. 1003-05).

As to Nelson's mental RFC, the two examining opinions stood in start contrast to one another, with the consultative examiner finding she was not limited in any way by her mental impairments and the other source opining her mental impairments

---

[4] Dr. McDonald noted the off-task time estimate was based on "patient's explanation." (Tr. 1005).

would preclude her from maintaining employment. Meanwhile, both state agency experts found Nelson was mildly limited by her mental impairments of depression and anxiety. Nelson's treating psychologist, Dr. Kennedy, opined Nelson would be seriously limited in her ability to maintain attention for two-hour segments and would be unable to meet competitive standards in maintaining regular attendance, being punctual, and performing at a consistent pace. (Tr. 1010). She opined that Nelson's ability to carry out very short and simple instructions varied from unlimited to seriously limited due to "brain fog." (Tr. 1010). Notably she also opined she was unlimited or very good in her ability to understand, remember, and carry out detailed instructions and deal with stress of semiskilled and skilled work, explaining when she is at her best, she seems to be able to function without limitations but frequently reports days of "brain fog" which limit her abilities. (Tr. 1011). She opined that Nelson had unlimited or satisfactory abilities in interacting with the public and maintaining socially appropriate behavior. (Tr. 1011). In contrast, consultative examiner Dr. Kochan-Dewey found Nelson had no limitations in any area of mental functioning, (Tr. 791-93), based upon her examination of the plaintiff which showed intact attention and concentration, memory, and average intellectual functioning as well as independent activities of daily living. (Tr. 789) .

As for the two state agency mental consultants, at the initial level, Dr. Karen Louise Plowman found the opinion of Dr. Kochan-Dewey was supported and consistent, but nonetheless opined Nelson had mild limitations in her ability to concentrate, persist, or maintain pace, but no limitations in any other area of functioning. (Tr. 76-77). Accordingly, Dr. Plowman concluded Nelson's mental impairments were not severe. (Tr. 77). On reconsideration, Dr. Roger K. Fretz reached the same conclusions, opining only that Nelson had mild limitations in her ability to concentrate, persist, or maintain pace, but no limitations in any other functional area. (Tr. 85).

It was against this medical backdrop that the ALJ came to hear Nelson's case.

### E. The ALJ Decision

A hearing was conducted in Nelson's case on December 6, 2022, at which Nelson and a vocational expert testified. (Tr. 39-65). Following this hearing, on January 30, 2023, the ALJ issued a decision in Nelson's case. (Tr. 14-37). In that decision, the ALJ first concluded that Nelson met the insured requirements of the Act through December 31, 2025, and had not engaged in substantial gainful activity since the alleged onset date of August 24, 2020. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Nelson had the severe

impairment of fibromyalgia, but that her Hashimoto's thyroiditis, breast cancer/status-post mastectomy, migraines, right sensorineural hearing loss (SNHL), Sjogren's syndrome, gastroesophageal reflux disease (GERD)/hepatic steatosis, major depressive disorder, and generalized anxiety disorder were not severe. (Tr. 20).

As to her mental impairments of major depressive disorder and generalized anxiety disorder, the ALJ considered the four broad functional areas of functioning set out by the regulations, or "paragraph B" criteria, in determining whether these impairments were severe. The ALJ concluded that Nelson had no limitations in understanding, remember, or applying information, interacting with others, or managing oneself, but mild limitations in concentrating, persisting, or maintaining pace. (Tr. 21).

At Step 3, the ALJ determined that Nelson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 22).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Nelson's impairments as reflected in the medical record, and found that:

13

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except can occasionally balance, stoop, kneel, crouch, crawl, use ramps and climb stairs and can perform jobs that do not require climbing ladders, ropes or scaffolding; can tolerate occasional exposure to vibration and can perform jobs that do not require exposure to workplace hazards, such as unprotected heights and dangerous, moving machinery.

(Tr. 22).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Nelson's self-described limitations. (Tr. 22-31). The ALJ first engaged in a two-step process to evaluate Nelson's alleged symptoms, finding that, although the plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 24).

In making this determination, the ALJ considered Nelson's statements and testimony regarding her impairments and limitations, noting:

> The claimant alleges Sjogren's syndrome, fibromyalgia, chronic fatigue, depression, postmastectomy mobility issues, Hashimoto's Thyroiditis, and gastroparesis limit her ability to work. She notes that she believes that her conditions(s) became severe enough to keep you from working on June 22, 2014; however, she reports that she stopped working on August 25, 2020 due to several reasons indicating that "aside from the debilitating health issues I had been dealing with for the past 15 years, my position was essentially phased out due to lack of

14

business due to the COVID pandemic. In addition, it is all but impossible to find another position, such as my last one, that enabled me the flexibility and accommodations I require" (Exhibit 2E/2-3). The claimant reports that she chronic fatigue and fibromyalgia makes it difficult and/or impossible to devote too much time/attention to any particular task without resting periodically throughout the day and even then, her concentration is affected. She reports that her conditions cause difficulty with lifting, squatting, standing, reaching, walking, kneeling, stair climbing, and concentrating. Despite her issues, she reports no problems showering and dressing, preparing meals, running errands, paying bills, and doing laundry and light housekeeping; she drives, shops in stores, as well as by phone, mail or by computer, manages her money, and socializes with others on a regular basis; and enjoys reading, watching television, puzzles/games, and computer genealogy research on a daily basis, albeit with periodic resting (Exhibit 5E). At the hearing, the claimant testified that the main reason she could not work was due to progressively worsening chronic fatigue and brain fog that "go hand-in-hand" with her autoimmune disorders, muscle weakness, full flu-like body aches that vary in intensity day by day, and daily pain. She testified that she could lift and carry no more than 20 pounds; could stand only for several minutes; and walk no longer than 10 to 15 minutes. She testified that she had no difficulty sitting, had no problems using her hands; and did not use any assistive devices. She testified that she could perform her activities of daily living but could not do any kind of deep cleaning, such as getting down on her knees and scrubbing (Hearing Testimony).

(Tr. 23).

The ALJ concluded that the previously summarized longitudinal medical evidence of record did not fully support her allegations concerning the intensity, persistence, and limiting effects of her symptoms, citing limited treatment for her fibromyalgia pain, large gaps in treatment, inconsistent reports of symptoms,

specifically around the time of her onset date, and unremarkable physical examinations. As the ALJ summarized:

> Notwithstanding the diagnosis, the record reflects very little objective evidence on clinical exams to substantiate the claimant's subjective complaints. Other than the rheumatology evaluation in June 2007 that noted 11/18 trigger points on exam and at the consultative exam from February 2022 noting an estimated 18/18 tender trigger points, as the claimant was tender all over the trigger points, the other physical exams in the record, as discussed, including emergency room findings and one rheumatological evaluation, are almost completely reported normal and do not support the claimant's alleged severity of symptoms and functional limitations (Exhibit 7F/2, 9F, 10F, 14F, 16F, 21F, 22F, 24F).

> All told, the undersigned has considered the effects of the claimant's fibromyalgia and giving consideration to the 18/18 tender trigger points noted only at the consultative exam in extending every benefit of doubt in lowering the claimant to the light exertional level and providing postural limitations. The undersigned provided environmental limitations to limit aggravation of symptoms and to prevent injury in the workplace. However, the degree of abnormality on diagnostic testing, the many clinical findings within normal limits and the absence of any prescribed treatment would not support greater limitations.

(Tr. 26-27).

Finally, the ALJ considered the medical opinion evidence. As to Nelson's physical impairments, the ALJ found the opinion of consultative examiner Dr. Monfared generally persuasive in that it found she was capable of light work but acknowledged it was a one-time snapshot of the claimant's function by a non-treating provider who was not familiar with the whole record. (Tr. 27). Moreover,

the ALJ noted that Dr. Monfared's opinion appeared to be heavily based on Nelson's subjective complaints, considering the unremarkable objective exam, except for the trigger points, and was not consistent with the many normal clinical findings and lack of treatment. (Id.) The ALJ found the opinions of Drs. Levandoski and Cuozzo partially persuasive to the extent the concluded she was capable of performing her past relevant work as an office manager, but felt Dr. Levandoski's opinion did not entirely account for ongoing physical pain complaints and fatigue and concluded additional postural limitations would be supported. (Tr. 27).

The ALJ was not persuaded by the outlier opinion of Dr. McDonnell, explaining that Dr. McDonnell's opinion was not supported by or consistent with his own clinical findings on repeat examinations that were consistently normal and his documentation of no objective evidence of autoimmune or neurological disease despite her diagnosis of fibromyalgia. (Tr. 28).

As to her mental conditions, the ALJ found the opinions of the state agency mental consultants[5] persuasive as they were consistent with and supported by the evidence that showed no more than counseling with no indication of recommendation for a more intensive level of care. The ALJ also found these

---

[5] The ALJ misnamed the two state agency consultants, an issue raised by the plaintiff and addressed below.

17

opinions consistent with Nelson consistently declining medication and stating she was "managing ok" and her reports that any functional limitations were a result of her physical, not psychological, issues. (Tr. 28). The ALJ also found the opinion of consultative examiner Dr. Kochan-Dewey persuasive and consistent with evidence of normal mental status exams and no prescribed treatment or indication of an exacerbation of symptoms that warranted a higher degree of treatment other than counseling. (Tr. 29).

As to the opinion of treating psychiatrist Dr. Kennedy, the ALJ found it unpersuasive. The ALJ concluded that the opinion of Dr. Kennedy was not supported by objective findings or consistent with examination findings in the record and appeared to be based on Nelson's own self-reporting. (Tr. 29-30). The ALJ also highlighted that Dr. Kennedy submitted only a summary of care that lacked any mental status exams but other evidence in the record reflected normal mental status exams, no prescribed treatment or indication of an exacerbation of symptoms that warranted a higher degree of treatment and from a physical standpoint, almost always normal physical exams, no treatment for her fibromyalgia, and no objective evidence of autoimmune or neurological disease. (Id.) The ALJ also noted the opinion was not consistent with or supported by Nelson's own testimony that indicated that she was receiving counseling only for assistance with coping skills,

was taking no prescribed medications, and was "managing OK" without any treatment. (Id.)

The ALJ also considered Nelson's activities of daily living and function report, which noted relatively limited activities but also indicated she was able to perform most personal tasks independently. (Tr. 30). The ALJ again noted that Nelson's position was essentially phased out due to lack of business due to the COVID pandemic, and observed that she went on vacation, reported that she had to retire early, and sought employment opportunities by obtaining training to provide notary services and by seeking some short writing assignments through internet sites. (Id.)

Having made these findings, the ALJ concluded that Nelson could perform her past relevant work as an office manager and had not been under a disability from the alleged onset date through the date of his decision. (Tr. 31).

This appeal followed. (Doc. 1). On appeal, Nelson argues that the ALJ failed to conduct a function-by-function assessment of her physical abilities with regard to her ability to sit, stand, and walk, and that the RFC is not supported by substantial evidence because the ALJ did not adequately evaluate her fibromyalgia or mental impairments. However, under Third Circuit guidance, since several experts found Nelson was capable of standing and/or walking for six hours in an eight-hour day,

the RFC limiting her to light work encompassed this sit/stand limitation and the ALJ was not required to include any specific sit/stand limitations in the RFC. Moreover, in our view, the limitations assessed by the ALJ in the RFC largely comported with the opinions of the experts and the longitudinal medical record showing conservative treatment and largely functional activities of daily living. Accordingly, finding that substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we will affirm the decision of the Commissioner.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.

>Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
>(comparing the substantial-evidence standard to the deferential clearly-
>erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

23

United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form

of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

26

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## F. **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at
*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.
Judicial review of this aspect of ALJ decision-making is still guided by several
settled legal tenets. First, when presented with a disputed factual record, it is well-
established that "[t]he ALJ – not treating or examining physicians or State agency
consultants – must make the ultimate disability and RFC determinations." Chandler
v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating
medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence
for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision
is accompanied by an adequate, articulated rationale, it is the province and the duty
of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without
crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
"SSR 96–2p does not prohibit the ALJ from crediting some parts of a
treating source's opinion and rejecting other portions"); Connors v.
Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
10, 2011). It follows that an ALJ can give partial credit to all medical
opinions and can formulate an RFC based on different parts from the

32

different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### G. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large

or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S.

at 565. Judged against these deferential standards of review, we find that substantial

evidence supported the decision by the ALJ that Nelson retained the residual

functional capacity to perform a range of light with some additional postural and

environmental limitations. Therefore, we will affirm this decision.

33

### *1. The Light Work RFC Implicitly Addressed Nelson's Limitations in Standing and Walking.*

The plaintiff first argues that the ALJ erred in limiting her to light work without including any specific standing or walking limitations despite finding the stand/walk limitations of three medical experts generally persuasive. She argues that, in failing to include any standing or walking limitations within the RFC assessment, the ALJ failed to conduct the requisite function-by-function assessment required by SSR 96-8p. Essentially, despite the RFC fashioned by the ALJ largely reflecting the opinions of the State agency experts, and specifically addressing her ongoing physical pain complaints and fatigue by adopting additional postural limitations, the plaintiff asks this Court to conclude, as a matter of law, that an RFC is deficient when it does not include specific limitations in standing and/or walking.

This we cannot do. In fact, the Third Circuit has rejected the argument that simply limiting a claimant to light work amounts to a failure to define sitting, standing, and walking limitations in terms of the RFC, but rather found that such a limitation implicitly addresses these functions. Navas v. Comm'r of Soc. Sec., 289 F. App'x 555, 558 (3d Cir. 2008) (rejecting a claimant's argument that the ALJ failed to define her sitting, standing, and walking limitations, stating "by finding that Navas could perform light work, the ALJ implicitly found that she could work at a job that

involves 'a good deal of walking or standing,' or a job that 'involves sitting most of

the time with some pushing and pulling of arm or leg controls.'"). Indeed, this Court

has affirmed decisions even where the ALJ did not discuss a claimant's ability to sit,

stand, or walk individually. For example, in a similar case, Magistrate Judge

Arbuckle explained:

> Plaintiff argues that the ALJ's RFC assessment is deficient as a matter
> of law because it does not include a function-by-function assessment of
> Plaintiff's limitations. In particular she argues that, instead of separately
> setting out the individual limitations to Plaintiff's ability to sit, stand,
> and walk, the ALJ simply cites to the definition of "light" work. (Doc.
> 13, pp. 5-6). Plaintiff is correct that neither the RFC assessment itself
> nor the narrative discussion that follows discusses Plaintiff's ability to
> sit, stand, or walk individually. We are not, however, persuaded that
> this issue requires remand.
>
> It is well-established that although an ALJ's RFC assessment "must first
> identify an individual's functional limitations or restrictions and assess
> his or her work-related abilities on a function-by-function basis," an
> ALJ is not required to use particular language or adhere to a particular
> format in conducting that analysis. Instead, an ALJ is only required to
> provide "sufficient development of the record and explanation of [his
> or her] findings to permit meaningful review." This principle has been
> extended to issues like this one, where an ALJ articulated an RFC
> assessment in terms of an exertional category without discussing
> sitting, standing, or walking separately.

Danielle R. v. Kijakazi, No. 1:22-CV-1446, 2023 WL 6130588, at *8 (M.D. Pa. July

28, 2023), report and recommendation adopted sub nom. Riebling v. Kijakazi, No.

1:22-CV-01446, 2023 WL 6129498 (M.D. Pa. Sept. 19, 2023) (citing Navas, 289 F.

at 558; <u>Johnny R. v. Kijakazi</u>, No. 2:20-CV-12818, 2023 WL 4073960, at *6 (D.N.J. June 20, 2023) (finding that an ALJ's RFC assessment limiting a claimant to sedentary work was effectively an assessment that the claimant could sit for up to six hours in an eight-hour workday, stand/walk for up to two hours in and eight-hour workday, and lift/carry up to ten pounds)).

Here, the ALJ found the opinions of Drs. Levandoski and Cuozzo, that Nelson could stand and/or walk for a total of six hours in an eight-hour workday, generally persuasive. (Tr. 27). He then concluded that Nelson could perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), but with some additional postural and environmental limitations to account for her "ongoing physical pain complaints and fatigue." (Tr. 27). SSR 83-10 explains, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." <u>Titles II & Xvi: Determining Capability to Do Other Work-the Med.- Vocational Rules of Appendix 2</u>, SSR 83-10 (S.S.A. 1983). Thus, since the opinion evidence which the ALJ found persuasive did not include any more extreme or specific sitting, standing, or walking limitations than what is already included in the light work limitation, no more was needed here.[6]

---

[6] The consultative examiner, Dr. Monfared, also opined that Nelson could stand for seven hours but could walk for only five hours in an eight-hour workday. However,

Two state agency consultant opinions found Nelson was capable of standing and/or walking for a total of six hours in an eight-hour workday – limitations which are fully compatible and "implicitly addressed" in a light work RFC. And these opinions are supported by substantial evidence where there is no objective evidence that Nelson's physical impairments significantly limited her ability to stand and/or walk and the ALJ included additional postural limitations to account for her subjective allegations of pain and fatigue. In our view, the plaintiff's argument may have resonance in cases where there is substantial additional evidence of limitations in a claimant's ability to sit stand walk that were not acknowledged or addressed by the ALJ. But here, where there is scant evidence of more extreme limitations, the plaintiff's argument exalts form over substance in a way that seems inconsistent with the deferential standard of review we are constrained to employ in these cases. Therefore, upon consideration we find that there was no error here.

---

Dr. Monfared also inexplicably opined that despite Nelson only being able to occasionally perform any postural activities she could frequently crawl. (Tr. 807). While the five-hour limitation for walking may fall below a light work RFC, the ALJ found Dr. Monfared's opinion persuasive only to the extent it indicated Nelson was capable of light work. (Tr. 27). The ALJ found the more restrictive aspects of the opinion of Dr. McDonald unpersuasive.

## 2. The ALJ's Evaluation of Nelson's Fibromyalgia is Supported by Substantial Evidence.

The plaintiff also argues the ALJ did not adequately consider her fibromyalgia in fashioning the RFC. She focuses on the statement of the ALJ that he found very little objective evidence to support the plaintiff's subjective complaints "other than . . . 11/18 trigger points" arguing that this line of reasoning was error since all that is required to support a fibromyalgia diagnosis is 11/18 trigger points and reports of widespread pain. The plaintiff mischaracterizes the ALJ's analysis. The ALJ acknowledged the plaintiff's fibromyalgia diagnosis and found the impairment to be severe at Step 2. Nonetheless, the ALJ found the plaintiff's subjective complaints relating to her fibromyalgia were not entirely consistent with the record. This conclusion was supported by substantial evidence and adequately articulated by the ALJ.

At the outset, it is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529). Thus, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 636 (3d. Cir. 2011) (citing 20 C.F.R. § 404.1529(a)). On

this score, when evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than

39

other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13-CV-2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

Here, the ALJ properly evaluated the plaintiff's fibromyalgia in fashioning the RFC. Despite the plaintiff's argument that the ALJ improperly dismissed her fibromyalgia despite evidence of 11/18 trigger points, the ALJ did, in fact, conclude that her fibromyalgia could be expected to produce the symptoms she alleged. Indeed, as the ALJ explained:

> All told, the undersigned has considered the effects of the claimant's fibromyalgia and giving consideration to the 18/18 tender trigger points noted only at the consultative exam in extending every benefit of doubt in lowering the claimant to the light exertional level and providing postural limitations. The undersigned provided environmental limitations to limit aggravation of symptoms and to prevent injury in the workplace. However, the degree of abnormality on diagnostic testing, the many clinical findings within normal limits and the absence of any prescribed treatment would not support greater limitations.

(Tr. 26-27).

It was at the second step of the credibility determination that the ALJ concluded Nelson's subjective complaints were not entirely consistent with the medical record. In so concluding, the ALJ properly considered the seven factors laid out by the regulations, including that Nelson lived alone and was fully independent in her activities of daily living, the consistently unremarkable objective examination findings, large gaps in treatment and the plaintiff's rejection of medication to treat her symptoms, and a lack of any conclusive diagnostic testing supporting her alleged

41

symptoms. Indeed, our review of the record, as summarized above, supports these findings.

Moreover, three of the four medical opinions were highly consistent and supported the ALJ's view that Nelson could perform light work. Thus, the ALJ's rejection of the outlier opinion of Nelson's treating provider, Dr. McDonald, was supported by substantial evidence and the ALJ's analysis of the medical opinion evidence complied with the regulations. As previously explained, Nelson's disability claim was filed after a paradigm shift in the requirements for an ALJ's assessment of medical opinion testimony. While prior to 2017 treating sources were generally entitled to more weight when considering competing medical opinions, the new regulations adopted a more holistic approach to the analysis, requiring the ALJ to evaluate all medical opinions based on their persuasiveness and explain how he or she considered the supportability and consistency of the medical opinion. Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Here, the ALJ found Dr. McDonnell's highly restrictive, outlier opinion that Nelson would be precluded from work-related activity, including being off-task more than 25% of the day, absences of more than four days per month, could sit no more than two hours in a day, and stand/walk less than two hours in an eight-hour

42

day, and would require frequent unscheduled breaks inconsistent and unsupported by the doctor's own clinical findings. Specifically, the ALJ noted that Dr. McDonnell frequently reported normal examinations and found no objective evidence of autoimmune or neurological disease other than elevated CRP in lab testing. Moreover, the ALJ pointed out that Dr. McDonnell's assessment even stated that some of the limitations he assessed were based upon the claimant's own descriptions and that he had identified no significant abnormalities other than a positive lip biopsy for Sjogren's fifteen years prior. Indeed, our review of the record supports this conclusion, since Nelson's treatment records, including those of Dr. McDonnell, simply do not support the restrictive limitations he opined.[7]

In sum, the ALJ's analysis of Nelson's subjective symptoms as well as the medical opinion evidence with regard to her fibromyalgia complied with the dictates of law and were supported by substantial evidence.

---

[7] Including a February 2022 note from Dr. McDonnell stating Nelson reported that her brain fog and difficulty concentrating had not caused any functional deficits, that she lived alone, managed her own finances, was not making mistakes in her checking account, and had no memory issues and Dr. McDonnell's own physical examination note stating Nelson looked "better than her diagnoses and her chief complaints." (Tr. 853, 855).

### 3. *The ALJ's Scrivener's Error was Harmless*

The plaintiff also challenges the ALJ's assessment of her mental RFC, arguing that it is not supported by substantial evidence. The plaintiff first points out an error in the ALJ's opinion where the ALJ referred to the medical opinions of state agency mental consultants as Dr. Melissa Franks and Dr. Francis Murphy. As the plaintiff highlights, the opinions of these doctors are not included in Nelson's record. Instead, the state agency mental consultants who opined on Nelson's mental RFC were Dr. Plowman and Dr. Fretz. The plaintiff argues this is evidence that the ALJ failed to discuss or consider the opinions of Dr. Plowman or Dr. Fretz, requiring remand. Indeed, according to the plaintiff, we have no way of knowing whether the ALJ saw these opinions. The Commissioner concedes the ALJ incorrectly named the medical experts, but argues any error was harmless. We agree.

On this score, Social Security appeals are also subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: " 'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.' " Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden

of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.' " Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

In this case, the ALJ misnaming the state agency mental consultants was harmless error. Upon review, while the ALJ clearly misnamed the medical experts who drafted the opinions, the substance of the opinions discussed by the ALJ was

45

identical to the opinions of Dr. Plowman and Dr. Fretz. Indeed, the ALJ explained that the state agency mental consultants both found only mild limitations in concentrating, persisting, or maintaining pace but none in the other areas of functioning and cited to the correct exhibits in the record. (Tr. 28). The ALJ then adopted these same limitations at Step 2. Given the substantive accuracy of this medical opinion summary, we conclude that the misnomer cited by the plaintiff was a scrivener's error of the type which does not otherwise compel a remand. Thus, it cannot be said that the outcome of Nelson's proceeding has been changed by this scrivener's error. Accordingly, the error was harmless.

### 4. The ALJ's Analysis of Nelson's Mental Impairments is Supported by Substantial Evidence

The plaintiff also challenges the overall RFC assessment of the ALJ with regard to her mental impairments, arguing it is not supported by substantial evidence. She first challenges the ALJ's determination at Step 2 that her mental impairments of depression and anxiety were not severe. At Step 2 of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). Step 2 of this sequential analysis is often the first

substantive benchmark an ALJ must address and is governed by familiar legal standards:

> With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *de minimus* screening device to dispose of groundless claims.' McCrea v. Comm. of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004); Newell v. Comm. of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). 'Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.' Id." Velazquez v. Astrue, No. 07–5343, 2008 WL 4589831, *3 (E.D. Pa., Oct. 15, 2008). Thus, "[t]he claimant's burden at step two is 'not an exacting one.' McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). This step should be 'rarely utilized' to deny benefits. Id. at 361. Rather, ... [a]n individual should be denied benefits at step two only if the impairment he presents is a 'slight abnormality' that has 'no more than a minimal effect on [his] ability to work.' Id." Kinney v. Comm'r of Soc. Sec., 244 F. App'x 467, 469–70 (3d Cir. 2007). Accordingly, "[d]ue to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." McCrea v. Commissioner of Social Sec., 370 F.3d 357, 360 (3d Cir. 2004).

Dotzel v. Astrue, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22, 2014). Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the

reviewing court may remand the matter to the Commissioner for further consideration. See Nosse v. Astrue, No. 08–[CV–1173, 2009 WL 2986612, *10] (W.D. Pa. Sept. 17, 2009).

McClease v. Comm. of Soc. Sec., No. 8–CV–1673, 2009 WL 3497775, *10 (E.D. Pa. Oct. 28, 2009); see also Salles v. Comm. of Soc. Sec., 229 Fed. App'x 140, 145, n. 2 (3d Cir. 2007) (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless."). Stouchko v. Comm'r of Soc. Sec., No. 1:12-CV-1318, 2014 WL 888513, at *10 (M.D. Pa. Mar. 6, 2014). Simply put, "because step two is to be rarely utilized as basis for the denial of benefits, [ ] its invocation is certain to raise a judicial eyebrow." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 361 (3d Cir. 2004) (citing SSR 85–28, 1995 WL 56856, at *4 ('Great care should be exercised in applying the not severe impairment concept')).

At the outset, we find that substantial evidence supported the ALJ's Step 2 determination that Nelson's mental impairments were not severe. As this Court has noted, "[a]n impairment significantly limits a Plaintiff's physical or mental abilities when its effect on the Plaintiff's ability to perform basic work activities is more than slight or minimal. . . . An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond

appropriately to supervision, coworkers, and work pressures." <u>Reichling v. Comm'r of Soc. Sec.</u>, No. 3:12-CV-01069, 2014 WL 3368823, at *16 (M.D. Pa. July 9, 2014) (citing 20 C.F.R. §§ 404.1545(c) and 416.945(c)). These four broad functional areas are known as the "paragraph B" criteria.

In determining that Nelson's mental impairments were not severe, the ALJ walked through each of the paragraph B functional areas and explained his analysis. As the ALJ explained:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation. The claimant does not allege any difficulties in understanding, remembering, or applying information. She engages in and performs a variety of tasks, including, preparing meals, running errands, paying bills, household chores, driving, shopping, reading, watching television, puzzles/games, and using the computer to shop and do genealogy research (Exhibit 5E, Hearing Testimony). The evidence reflects only counseling for assistance with coping skills; however, the evidence lacks any mental health treatment, prescribed or otherwise and the claimant testified that she is "managing OK" without any treatment (Hearing Testimony). Repeat mental status exams, when reported in the record, are normal (Exhibits 8F, 9F, 10F, 13F, 16F, 22F, 24F). The State agency opined no limitations in understanding, remembering, or applying information (Exhibits 2A/5, 3A/4). The undersigned agrees and finds that the evidence supports no limitations in understanding, remembering, or applying information.

> The next functional area is interacting with others. In this area, the claimant has no limitation. The claimant does not allege any difficulties in interacting with others. While she reports less of a social life, she socializes and spends time with others in person, on the phone, by email or texting. She reports that she avoids events that require a great deal of

49

walking or standing; however, she gets together with others for meals, special occasions, and holidays (Exhibit 5E, Hearing Testimony). Other than counseling, the evidence lacks any mental health treatment, prescribed or otherwise and the claimant testified that she is "managing OK" without any treatment (Hearing Testimony). Repeat mental status exams, when reported in the record, are normal and describe her as cooperative and pleasant (Exhibits 8F, 9F, 10F, 13F, 16F, 22F, 24F). The State agency opined no limitations in interacting with others (Exhibits 2A/5, 3A/4). The undersigned agrees and finds that the evidence supports no limitation in interacting with others.

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. The claimant alleges difficulty concentrating and states that this is due to chronic fatigue and fibromyalgia, which makes it difficult and/or impossible to devote too much time/attention to any particular task without resting periodically throughout the day and even then, her concentration is affected. She testified that symptoms of anxiety but mainly, her physical symptoms are distracting. Despite her issues, she reports no problems showering and dressing, preparing meals, running errands, paying bills, and doing laundry and light housekeeping; she drives, shops in stores, as well as by phone, mail or by computer, manages her money, and enjoys reading, watching television, puzzles/games, and computer genealogy research on a daily basis, albeit with periodic resting (Exhibit 5E, Hearing Testimony). The evidence indicates that she obtained training to provide notary services and by seeking some short writing assignments through internet sites (Exhibit 12F). The claimant testified that she has no mental health treatment other than counseling, has declined any medications, and is "managing OK" (Hearing Testimony). Repeat mental status exams, when reported in the record, are normal (Exhibits 8F, 9F, 10F, 13F, 16F, 22F, 24F). The State agency opined mild limitations in concentrating, persisting, or maintaining pace (Exhibits 2A/5, 3A/4). The undersigned agrees and finds that the evidence supports no more than a mild limitation in concentrating, persisting, or maintaining pace.

The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. The claimant testified that while depression and anxiety affect her ability to work; she is not undergoing any formal mental health treatment, other than counseling, and has declined any medications. She reports that she handles stress and changes well and overall, she is "managing OK" without treatment; she engages in and performs a variety of tasks, including, preparing meals, running errands, paying bills, household chores, driving, shopping, reading, watching television, puzzles/games, and using the computer to shop and do genealogy research, albeit with resting periodically throughout the day (Exhibit 5E, Hearing Testimony). Repeat mental status exams, when reported in the record, are normal (Exhibits 8F, 9F, 10F, 13F, 16F, 22F, 24F). Other than the counseling, the undersigned finds that the evidence lacks any formal mental health treatment and is without evidence of recommendation for a more intensive level of care, such as inpatient psychiatric hospitalization, partial hospitalization programming, or structure living. The State agency opined no limitations in adapting or managing oneself (Exhibits 2A/5, 3A/4). The undersigned agrees and finds that the evidence supports no limitation in adapting or managing oneself.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

(Tr. 20-21).

Thus, the ALJ concluded that Nelson had only mild limitations in concentrating, persisting, and maintaining pace and no limitations in any other area of functioning. This conclusion was supported by the plaintiff's own statements and allegations regarding the limiting effects of her impairments, as well as her activities

of daily living, which were wholly independent and functional, the limited treatment she received for her mental impairments, and the unremarkable mental status examination findings throughout the record.

The ALJ's determination that Nelson had only a mild limitation in one area of functioning and no limitations in the others is also supported by the opinions of the medical experts the ALJ determined deserved the greatest weight, the state agency mental consultants, whose opinions after reviewing the medical record are wholly consistent with the findings of the ALJ. The conclusions of the ALJ were also largely supported by the opinion of the consultative examiner, who found Nelson had no functional limitations due to her mental impairments. Indeed, the only opinion that would support more restrictive limitations was that of Nelson's treating psychologist, Dr. Kennedy, whose opinion the ALJ found not persuasive. And while the plaintiff now challenges that determination, substantial evidence supported this assessment of the medical opinion evidence as the state agency medical consultants' opinions were supported and explained in terms of objective clinical findings and are consistent with Nelson's treatment records showing overwhelmingly normal examination results. Conversely, as the ALJ explained, the opinions of Dr. Kennedy:

> [A]re not supported by objective findings or consistent with examination findings in the preponderance of the record. Specifically, Dr. Kennedy notes the claimant's symptoms, which appear to be based

upon the claimant's own self-reporting (Exhibits 16E/2-5, 12F). Dr. Kennedy submitted only a summary of care that lacks any mental status exams. Furthermore, the other evidence reflects normal mental status exams, when reported in the record; no prescribed treatment or indication of an exacerbation of symptoms that warranted a higher degree of treatment and from a physical standpoint, almost always normal physical exams, no treatment for her fibromyalgia, and had no objective evidence of autoimmune or neurological disease (Exhibits 8F, 9F, 10F, 12F, 13F, 16F, 22F, 24F). Moreover, this is not consistent with or supported by the claimant's testimony that indicated that she was receiving counseling only for assistance with coping skills, was taking no prescribed medications, and was "managing OK" without any treatment (Hearing Testimony).

(Tr. 29-30). We find no error in the ALJ's treatment of this medical opinion evidence since it largely complies with the requirement that an ALJ evaluate all medical opinions based on their persuasiveness and explain how he or she considered the supportability and consistency of the medical opinion. Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020). Since the ALJ's determination that plaintiff's mental impairments were nonsevere is supported by the medical record and opinions, the ALJ's Step 2 determination was supported by substantial evidence.

Moreover, even if the ALJ did err in some degree when concluding at Step 2 that her mental impairments were not severe, any error was cured since the ALJ adequately considered her mental impairments at Steps 2 through 5. McClease v. Comm. of Soc. Sec., 2009 WL 3497775 at *10. Indeed, the ALJ properly evaluated

the plaintiff's mental impairments throughout the rest of the opinion and was not in error in failing to include any mental limitations in the RFC. The plaintiff argues that, even assuming her mental impairments are non-severe, the ALJ's failure to include limitations related to the non-severe mental impairments in the RFC was error. We agree it is well settled that, despite a finding of non-severe mental impairments at Step 2, an ALJ must at least consider those impairments when fashioning the RFC. This Court has recognized the requirement that:

> As a general matter, an ALJ must consider limitations and restrictions associated with all of a claimant's impairments, both severe and non-severe, when formulating the RFC. 20 C.F.R. § 404.1545(a)(2). "[T]he Commissioner's procedures do not permit the ALJ to simple rely on his finding of non-severity as a substitute for a proper RFC analysis." Wells v. Colvin, 727 F.3d 1061, 1065 (10th Cir. 2013). "A conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ to simply disregard those impairments when assessing a claimant's RFC and making conclusions at step four and five." Id. at 1068–69.

Kich v. Colvin, 218 F. Supp. 3d 342, 355–56 (M.D. Pa. 2016). Thus,

However, "the ALJ's consideration of the individual's non-severe impairments does not amount to a requirement that the ALJ must include limitations in the RFC associated with mild impairments." Weidner v. Kijakazi, No. CV 20-1250-MN, 2022 WL 610702, at *9 (D. Del. Feb. 1, 2022), report and recommendation adopted, No. CV201250MNSRF, 2022 WL 610678 (D. Del. Feb. 16, 2022) (citing Smith v.

Comm'r of Soc. Sec., 2016 WL 3912850, at *9 (D.N.J. July 19, 2016)). Instead, the requirement that an ALJ must explain the reasons for excluding mild mental functional limitations is cabined by the Third Circuit's holding in Hess that an ALJ's mental RFC assessment should be upheld "as long as the ALJ offers a 'valid explanation,'" for that assessment. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). Indeed, as previously noted, an ALJ offers a valid explanation of a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019). See also Shaffer v. Colvin, 2014 WL 4925067, at *5 (W.D. Pa. Sept. 30, 2014) ("It is clear from the record that the ALJ adequately considered all of the relevant medical evidence, as well as plaintiff's reported activities, in assessing plaintiff's residual functional capacity, and that he incorporated into his finding all of the limitations that reasonably could be supported by the medical and other relevant evidence."); McCafferty v. Astrue, 2008 WL 1869282, at *4 (E.D. Pa. Apr. 25, 2008) (finding that the requirements of SSR 96-8p were satisfied by ALJ's narrative discussion of the claimant's functional limitations in the context of the objective medical evidence,

doctors' notes and opinions, the claimant's activities of daily living, and the claimant's subjective complaints).

In our view, the ALJ's decision not to include mental limitations in the RFC was both adequately articulated and supported by substantial evidence. The evidence showed, and the plaintiff admitted, that she was "managing ok" despite her mental impairments, that her brain fog and difficulty concentrating were not causing any functional deficits, and that her activities of daily living were wholly independent. She received minimal treatment for her mental impairments, including counseling but no medication, and a consultative examination showed intact attention and concentration, memory, and average intellectual functioning. (Tr. 789). Although brain fog and fatigue are noted throughout her sparse medical records, which the ALJ accounted for in including additional postural limitations, there is no objective evidence to support any significant limitations in mental functioning, particularly where the only record provided by her treating psychiatrist is a summary of care that does not show regular mental status examination findings. Since the plaintiff has provided no evidence of what limitations the ALJ was required to include with regard to her mental functioning, we cannot conclude the ALJ erred in his assessment of these impairments.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.    <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>s/ Martin C. Carlson</u>
Martin C. Carlson
United States Magistrate Judge

DATED: September 22, 2025